USDC SCAN INDEX SHEET

















RYC   12/5/03    14:18
3:98-CV-00139    FREEMAN V. SAN DIEGO ASSOC OF
*653*
*O.*

FILED

03 DEC -5  AM 8: 30

CLERK. U. DISTRICT COURT.
SOUTHERN DISTRICT OF CALIFORNIA

BY_____DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARLEEN FREEMAN *et al.*,<br><br>                    Plaintiffs,<br><br>v.<br><br>SAN DIEGO ASSOCIATION OF REALTORS, *et al.*,<br><br>                    Defendants. | Civil No. 98cv0139-L(JMA)<br><br>**ORDER REGARDING PLAINTIFFS' MOTION FOR ENTRY OF ORDER GRANTING SUMMARY JUDGMENT REGARDING LIABILITY IN FAVOR OF PLAINTIFFS**<br><br>[Docket No. 608] |

This matter comes before the Court on Plaintiffs' motion for entry of order granting summary judgment regarding liability in favor of the Plaintiffs.  The Court finds this matter suitable for determination on the papers submitted and without oral argument pursuant to Civil Local Rule 7.1(d)(1).

## BACKGROUND

Before 1992, 12 multiple listing services ("MLS")[1] served San Diego County, each operated by a different real estate trade association serving subscribers in a particular region of the county.  *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1140 (9th Cir. 2003).

---

[1]  "The MLS is a computerized medium by which real estate agents exchange information on properties that are for sale or have been recently sold."  *Freeman v. San Diego Ass'n of Realtors*, 77 Cal. App. 4th 171, 178-79 (1999).

653

1  Some of these MLSs shared common databases of listings. *Id.* The direct cost of maintaining

2  each database was allocated among the associations using it. *Id.* The associations each provided

3  their own support services, which varied from one to the next, and they all set the prices they

4  charged agents independently. *Id.* There were four different MLS databases in total, so a real

5  estate agent who wanted access to all properties in San Diego County had to subscribe to more

6  than one MLS. *Id.*

7      Eleven of the 12 MLS operators were local Associations of Realtors, professional groups

8  with ties to the California Association of Realtors ("CAR") and the National Association of

9  Realtors. *Id.* In 1990-91, the eleven associations decided to combine their databases, giving

10  their agents access to all San Diego County properties through a single MLS and reducing

11  operating costs. *Id.* The representatives adopted a centralized business model whereby Sandicor

12  is a corporation and the associations own its shares and appoint its directors. *Id.* at 1141. The

13  associations operate under service agreements with Sandicor that outline in general terms the

14  support services they must perform for subscribers. *Id.* Associations sign up new MLS

15  subscribers and collect MLS fees from subscribers on Sandicor's behalf, but Sandicor

16  determines the fee agents must pay to subscribe. *Id.* Associations are prohibited from

17  discounting Sandicor's MLS fee or crediting any portion of it against other purchases. *Id.* The

18  service agreements between Sandicor and the associations specify a support fee that Sandicor

19  pays each association in return for the support services the association provides to subscribers.

20  *Id.* Thus, subscribers do not pay the associations for support services directly; they pay

21  Sandicor's MLS fee, and Sandicor then returns part of that fee as a support fee to the

22  associations. *Id.* The support fee, like the MLS fee, is assessed on a per-subscriber basis. *Id.*

23  Although Sandicor experimented with different pricing policies, during most of the relevant

24  period it charged fees based on the number of individuals who used the MLS. *Id.*

25      The associations originally set the support fee at $25 per subscriber per month. *Id.* As a

26  result, Fallbrook and Valley Center would provide services to their subscribers at a loss. *Id.* To

27  make up the shortfall, the other associations agreed to pay them fixed monthly cash subsidies.

28  ///

1 | *Id.* According to Defendants, this centralized model was necessary to ensure the smaller
2 | associations' viability. *Id.*

3 | Plaintiffs Arleen Freeman and James Alexander are San Diego County real estate agents
4 | who subscribe to Sandicor's MLS. *Id.* They filed this action alleging the price of Sandicor's
5 | MLS is inflated because the support fees Sandicor pays the associations are fixed at a
6 | supracompetitive level, and that real estate agents are injured because Sandicor passes on the
7 | higher support fees in the form of higher MLS fees. Plaintiffs also alleged Defendants conspired
8 | to forbid Sandicor from selling directly to the MLS class, creating an unlawful "group boycott."

9 | The parties filed cross-motions for summary judgment. On June 27, 2001, this Court
10 | granted the Defendants' motion for summary judgment as to Plaintiffs' Sherman Act claims,
11 | denied as moot the Defendants' remaining motions for summary judgment, and denied
12 | Plaintiffs' motion for summary judgment.

13 | In a published decision, the Ninth Circuit Court of Appeals affirmed the grant of
14 | summary judgment in favor of the Defendants on the Sherman Act Section 2 claims, affirmed
15 | the grant of summary judgment in favor of CAR on all claims, and reversed the denial of
16 | Plaintiffs' motion for summary judgment on their Sherman Act Section 1 claim as to all
17 | Defendants except CAR. *Id.* at 1157. The appellate court also affirmed an award of discovery
18 | sanctions against the Defendants. *Id.* On remand, the case is proceeding against Defendants San
19 | Diego Association of Realtors, North San Diego County Association of Realtors, Pacific
20 | Southwest Association of Realtors, Inc., East San Diego County Association of Realtors,
21 | Coronado Association of Realtors, and Sandicor, Inc. (collectively referred to as the "Remaining
22 | Defendants.")

23 | **DISCUSSION**

24 | Plaintiffs request this Court enter an order entering partial summary judgment of liability
25 | in their favor on their Sherman Act Section 1 claim against the Remaining Defendants.
26 | Plaintiffs state the order should be based on the Remaining Defendants' practice of fixing the
27 |
28 |

98cv0139

1   price of MLS support services, and their prohibition of refunds or discounts of the Sandicor fee.[2]

2   The Remaining Defendants oppose this motion.  They maintain Plaintiffs' proposed language of

3   "partial summary judgment of liability" is ambiguous and overbroad, reaching issues that were

4   never raised before this Court nor adjudicated by the Ninth Circuit.[3]

5   **I.   Rule of Mandate**

6          Under the rule of the mandate, lower courts are bound to execute the terms of a mandate.

7   *United States v. Kellington*, 217 F.3d 1084, 1092 (9th Cir. 2000).  However, lower courts are

8   free to do "'anything not foreclosed by the mandate.'"  *Id.* (*quoting Herrington v. County of*

9   *Sonoma*, 12 F.3d 901, 904 (9th Cir. 1993)); *accord Edlin v. M/V Truthseeker*, 69 F.3d 392, 393

10  (9th Cir. 1995).  Further "under certain circumstances, '[a]n order issued after remand may

11  deviate from the mandate . . . if it is not counter to the spirit of the circuit court's decision.'"

12  *Kellington*, 217 F.3d at 1093 (*quoting Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1404 (9th

13  Cir. 1993)) (alteration in original).  Thus, "although the mandate of an appellate court forecloses

14  the lower court from reconsidering matter determined in the appellate court, it leaves to the

15  district court any issue not expressly or impliedly disposed of on appeal." *Id.* at 1094 (internal

16  quotations omitted).  In construing the mandate, lower courts "consider the opinion the mandate

17  purports to enforce as well as the procedural posture and substantive law from which it arises."

18  *Id.* at 1093.

19  **II.   Proper Scope of the Summary Judgment Order**

20         The Remaining Defendants contend that notwithstanding the Ninth Circuit's finding of a

21  *per se* Sherman Act Section 1 violation, Plaintiffs must still establish antitrust injury and injury-

22

23

---

24         [2] Plaintiffs' proposed order explicitly declines to address the practices challenged by
    Plaintiffs and not resolved by the Ninth Circuit, including claims that Defendants fixed the
25  associations' retail prices on books, "tour inputs," computer assistance by association staff, and
    lockboxes and replacement keypads; and Sandicor's policy of mandating "uniform" support
26  services and a standardized splash screen.

27         [3] Remaining Defendants further contend that the proposed order is unnecessary and futile
    because they have filed a petition for writ of *certiorari* before the United States Supreme Court.
28  While this motion was pending, the United States Supreme Court denied the Remaining
    Defendants' petition.

1    in-fact to recover under Section 4 or Section 16 of the Clayton Act.[4]  Plaintiffs respond their

2    motion before this Court presented extensive evidence that the Remaining Defendants' price-

3    fixing scheme harmed competition, and maintain the Ninth Circuit held Plaintiffs had proven

4    antitrust injury.[5]

5        Section 4 of the Clayton Act allows private persons to sue for antitrust violations and

6    recover treble damages as well as costs and attorneys' fees. 15 U.S.C. § 15(a); *Glen Holly*

7    *Entertainment, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1007 (9th Cir. 2003).  However, to pursue a

8    claim under the statute, a plaintiff must meet the requirements for antitrust standing.[6]  *Associated*

9    *Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534-35 (1983);

10    *Glen Holly*, 343 F.3d at 1007; *American Ad Mgmt, Inc. v. General Tel. Co. of California*, 190

11    F.3d 1051, 1054 (9th Cir. 1999). "To determine whether that requirement is met, the court must

12    'evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship

13    between them.'" *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000)

14    (*quoting Associated Gen.*, 459 U.S. at 535).  The Ninth Circuit has identified five factors for

15    determining whether a plaintiff has antitrust standing: "(1) the nature of the plaintiff's alleged

16    injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the

17

---

18      [4] The Remaining Defendants also argue Plaintiffs will not be able to establish antitrust

19    standing because they cannot show they have suffered antitrust injury or injury in fact.  The
Court declines to address these arguments at this stage of the proceedings as it is outside of the

20    scope of Plaintiffs' motion.

21      [5] In their reply brief filed in support of their motion for interim attorneys' fees, Plaintiffs
argue that the Remaining Defendants' argument antitrust standing has not been established raises

22    factual issues that should have been raised before the case was appealed.  Plaintiffs' position, in
effect, is that the Remaining Defendants have waived this argument.  The Court is not

23    persuaded.  Plaintiffs bear the burden of establishing antitrust standing in addition to proving
unlawful conduct. *See Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429 U.S. 477, 489 (1977).

24    Plaintiffs have not cited any authority supporting their argument that the Remaining Defendants
have waived this defense, and accordingly, at this time this Court declines to so hold.

25      [6] Section 16 of the Clayton Act authorizes preliminary and permanent injunctive relief

26    for antitrust violations.  The requirements for antitrust standing under Section 16 are less
stringent than those under Section 4.  *Lucas v. Bechtel Corp.*, 800 F.2d 839, 847 (9th Cir. 1986).

27    For example, section 4 requires the plaintiff to show actual injury, but section 16 requires only a
showing of "threatened" loss or damage. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S.

28    104, 111 (1986).  Both sections, however, require a plaintiff to establish an injury of the type the
antitrust laws were designed to prevent. *Id.*

1  directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative

2  recovery; and (5) the complexity in apportioning damages." *American Ad*, 190 F.3d at 1054;

3  *accord Knevelbaard Dairies*, 232 F.3d at 987.

4        The first factor regarding the nature of the plaintiff's alleged injury requires a showing of

5  antitrust injury. *Glen Holly*, 343 F.3d at 1107-08; *Knevelbaard Dairies*, 232 F.3d at 987.

6  Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows

7  from that which makes defendants' acts unlawful." *Atlantic Richfield Co. v. USA Petroleum*

8  *Co.*, 495 U.S. 328, 334 (1990); *accord Knevelbaard Dairies*, 232 F.3d at 987. Parsing the

9  Supreme Court's language the Ninth Circuit has identified four components to antitrust injury:

10  "'(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which

11  makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to

12  prevent.'" *Glen Holly*, 343 F.3d at 1008 (*quoting American Ad*, 190 F.3d at 1055). This Circuit

13  also imposes a fifth element: that "the injured party be a participant in the same market as the

14  alleged malefactors." *Id.* (internal quotations omitted); *American Ad*, 190 F.3d at 1057. Thus,

15  the injured party "'must be either a consumer of the alleged violator's goods or services or a

16  competitor of the alleged violator in the restrained market.'" *Glen Holly*, 343 F.3d at 1008

17  (*quoting Eagle v. Star-Kist Foods, Inc.*, 821 F.2d 538 (9th Cir. 1987)); *accord American Ad*, 190

18  F.3d at 1057.

19        The second requirement for antitrust standing concerns the directness of the injury. Thus,

20  the "plaintiffs must prove injury in fact, and the claimed injury must be sufficiently direct."

21  *Knevelbaard Dairies*, 232 F.3d at 989. A plaintiff must show more that a causal link; rather, he

22  must establish a direct effect. *Id.* In analyzing this issue, the court "'look[s] to the chain of

23  causation between [plaintiff's] injury and the alleged restraint in the market.'" *Id.* (*quoting*

24  *American Ad*, 190 F.3d at 1058) (alterations in original).

25        The Ninth Circuit held that the Remaining Defendants' agreement to establish a fixed,

26  uniform support service fee is a *per se* violation of Section 1. In so holding, the appellate court

27  found the Remaining Defendants fixed the support service fee at a level more than twice what it

28  cost the most efficient association to provide the support services, and then harmed subscribers

98cv0139

1  by passing the inflated fees in the form of higher MLS fees. *Freeman*, 322 F.3d at 1145. One

2  portion of the *Freeman* opinion summarizes this holding, stating that:

3        The associations engaged in price fixing, and plaintiffs have standing to sue
   them. The associations purposely fixed the support fee they charged Sandicor at a
4  supracompetitive level. [footnote] Sandicor passed on some portion of that
   inflated support fee to agents, who paid higher prices for the MLS as a result. This
5  is precisely the type of injury the antitrust laws are designed to prevent.

6  *Id.* at 1147.

7        The Remaining Defendants maintain the Ninth Circuit's discussion regarding

8  supracompetitive prices is dicta and unsupported by the record. They further argue that the

9  quoted paragraph cannot be interpreted as holding that Plaintiffs have suffered antitrust injury

10  and injury in fact. The Court disagrees with the Remaining Defendants' first argument, but

11  concurs that the Ninth Circuit did not find Plaintiffs have standing under the Clayton Act.

12        The Ninth Circuit's opinion and the record indicates that the Remaining Defendants'

13  agreement to fix the price for support services and the prices at which they were fixed were

14  issues briefed before this Court and the Ninth Circuit. The Ninth Circuit's discussion of the

15  service center support fees being fixed at inflated rates and then passed on to MLS subscribers

16  formed part of its holding that the Remaining Defendants engaged in illegal price-fixing. *See id.*

17  at 1145. The appellate court found there was "unmistakable evidence" that Sandicor passed on

18  inflated support fees to MLS subscribers. *Id.* This Court declines the Remaining Defendants'

19  invitation to disregard this portion of the *Freeman* opinion and conclude that the record reveals

20  issues of fact as to whether the price of an MLS subscription or in particular, the service center

21  fee, was at a competitive level. To do so would be to override the Ninth Circuit's findings on

22  the issue. The rule of mandate prohibits this Court from doing so. *See Kellington*, 217 F.3d at

23  1094.

24        The quoted paragraph also states that Plaintiffs have standing to sue the Remaining

25  Defendants, and that they were injured by having to pay higher MLS fees. This language might

26  be interpreted to hold that Plaintiffs have antitrust standing under the Clayton Act. However,

27  "the Supreme Court has noted that '[a] showing of antitrust injury is necessary, but not always

28  ///

1   sufficient, to establish standing under § 4.'" *American Ad*, 190 F.3d at 1055 (*quoting Cargill*,

2   479 U.S. at 110 n.5) (alteration in original).

3       Further, in general, "'a federal appellate court does not consider an issue not passed upon

4   below.'" *Dodd v. Hood River County*, 59 F.3d 852, 863 (9th Cir. 1995) (*quoting Singleton v.*

5   *Wulff*, 428 U.S. 106, 120 (1976)). This is not a "hard and fast rule," "[c]ertainly there are

6   circumstances in which a federal appellate court is justified in resolving an issue not passed on

7   below, as where the proper resolution is beyond any doubt, or where injustice might otherwise

8   result." *Id*. (internal citation and quotations omitted). A review of the record demonstrates that

9   this Court did not rule on whether Plaintiffs had discharged their burden of showing antitrust

10  standing under the Clayton Act.

11      In the parties' motions for summary judgment, the Defendants argued that Plaintiffs, as

12  indirect purchasers, lacked standing to sue under the *Illinois Brick* doctrine.[7] Defendants

13  advanced this argument before the Ninth Circuit, which decided the issue in Plaintiffs' favor.

14  The proceedings before this Court and the portions of the appellate record that have been

15  submitted do not address the Clayton Act's requirements for standing. Significantly, *Freeman*

16  does not discuss the five factors that courts must balance in determining whether a plaintiff has

17  antitrust standing under Section 4 of the Clayton Act. Thus, the opinion's statement that

18  Plaintiffs have standing must be limited to the *Illinois Brick* doctrine.

19      There is a difference between finding a Sherman Act Section 1 violation, and establishing

20  the Remaining Defendants' liability to the Plaintiffs for that violation. For the latter, the

21  Plaintiffs must show they have antitrust standing. *See Atlantic Richfield*, 495 U.S. at 341.

22  Although the Ninth Circuit concluded the Defendants' price-fixing scheme violates Section 1 of

23  the Sherman Act, it did not address whether Plaintiffs can now recover money damages under

24  Section 4 of the Clayton Act or obtain injunctive relief under Section 16 of that statute.[8]

25  _____

26      [7] In *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), the Supreme Court held that an
    indirect purchaser does not have standing to sue under Section 1.

27      [8] The Ninth Circuit's opinion is somewhat equivocal about what injunctive relief
28  Plaintiffs could obtain:
        Although decentralizing Sandicor would be one way to remedy the price-

98cv0139

1   Accordingly, the Court concurs with the Remaining Defendants that a partial summary judgment

2   order finding liability to the Plaintiffs is inappropriate at this time.

3          Finally, the Remaining Defendants object to the language in the Plaintiffs' proposed order

4   stating that the discount ban also constitutes a Sherman Act Section 1 violation.  They contend

5   that the Ninth Circuit's discussion on the issue is dicta.  The passage in dispute states,

6               The discount ban, while not necessary to our finding of a section 1
            violation, certainly supports our conclusion.  Agreements not to offer discounts are
7           per se violations of section 1.  [citations]  If associations were permitted to refund
            part of Sandicor's MLS fee to subscribers, they could compete on price
8           notwithstanding the contractually fixed support fee.  [footnote]  Without the ban,
            the price-fixing structure might well have collapsed.  We can conceive of no
9           legitimate justification for it, and defendants have offered none.

10  *Freeman*, 322 F.3d at 1146-47.

11         The phrase "while not necessary to our finding" underscores the Ninth Circuit's

12  conclusion that the price fixing scheme is a *per se* violation of Section 1 of the Sherman Act.

13  The passage's conclusion that there is no legitimate justification for the ban leaves no room for

14  debate that the appellate court found the evidence in the record establishes the ban violates

15  federal antitrust law.  In contrast to the issue of antitrust standing under the Clayton Act,

16  Plaintiffs raised the issue of the discount ban before this Court and the Ninth Circuit.  (*See, e.g.*,

17  Cohler Decl. in Oppo. to Plts' Mtn. to Certify a Class Exh. 5 at 96.)  Accordingly, Plaintiffs'

18  inclusion of the discount ban in their proposed order was appropriate.

19                                  **CONCLUSION**

20         Having carefully reviewed the Ninth Circuit's opinion in *Freeman v. San Diego Ass'n of*

21  *Realtors*, 322 F.3d 1133 (9th Cir. 2003), the parties' briefs, applicable law, and good cause

22  appearing, **IT IS HEREBY ORDERED**:

23         1.  Plaintiff's motion for entry of summary judgment is **GRANTED IN PART AND**

24  **DENIED IN PART** [docket no. 608].

25  *///*

26  _____

27         fixing violation, it is not the only way, and Freeman had no right to insist on it.
        *Whether the district court may now order Sandicor to decentralize as a matter of*
28      *equitable relief is a different story, and an issue we need not decide.*
    *Freeman*, 322 F.3d at 1156 n.31 (emphasis added).

                                    9                                    98cv0139

1    2. Defendants San Diego Association of Realtors, North San Diego County Association

2  of Realtors, Pacific Southwest Association of Realtors, Inc., East San Diego County Association

3  of Realtors, Coronado Association of Realtors, and Sandicor, Inc. violated Section 1 of the

4  Sherman Act, 15 U.S.C. § 1 by entering into an agreement to fix the prices of MLS support

5  services, and prohibiting refunds or discounts of the Sandicor fee.

6    This order does not address, and the Court makes no ruling on, the practices challenged

7  by the Plaintiffs and not resolved by the Ninth Circuit, including claims that Defendants fixed

8  the associations' retail prices on books, "tour inputs," computer assistance by association staff,

9  lockboxes and replacement keypads, and Sandicor's policy of mandating "uniform" support

10  services and a standardized splash screen.

11    This order also does not address and the Court makes no ruling on, whether Plaintiffs

12  meet all the requirements for antitrust standing under Section 4 or Section 16 of the Clayton Act.

13    **IT IS SO ORDERED**.

14  Dated: *12/2/03*                    M. JAMES LORENZ

15                                      UNITED STATES DISTRICT JUDGE

    COPY TO:

16
    HON. JAN M. ADLER
17  UNITED STATES MAGISTRATE JUDGE

18  ALL PARTIES/COUNSEL

19

20

21

22

23

24

25

26

27

28